# Exhibit 2



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed: COMPLAINT**
**August 23, 2021 15:27**

By: JAMES B. NIEHAUS 0020128

Confirmation Nbr. 2333293

JOHN K. LANE, ET AL                              CV 21 952011

vs.

MR. YANG HAOZHI, ET AL                    **Judge:**  SHANNON M. GALLAGHER

**Pages Filed:**  24

COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| John K. Lane, Receiver for Hall Street | ) | |
| Company, f/k/a The Robbins Company | ) | |
| 29100 Hall Street, | ) | |
| Solon, Ohio 44139, | ) | CASE NO.: |
| | ) | |
| Plaintiff, | ) | JUDGE |
| | ) | |
| v. | ) | |
| | ) | |
| Mr. Yang Haozhi, | ) | |
| No. 16 Kaifa Road, | ) | |
| Economic & Technological | ) | |
| Development Zone, | ) | |
| Shenyang, Liaoning Province, 110141, | ) | |
| P.R. China, | ) | |
| | ) | |
| Mr. Yang Liang, | ) | |
| No. 16 Kaifa Road, | ) | |
| Economic & Technological | ) | |
| Development Zone, | ) | |
| Shenyang, Liaoning Province, 110141, | ) | |
| P.R. China, | ) | |
| | ) | |
| Mr. Ge Bing, | ) | |
| No. 16 Kaifa Road, | ) | |
| Economic & Technological | ) | |
| Development Zone, | ) | |
| Shenyang, Liaoning Province, 110141, | ) | |
| P.R. China, | ) | |
| | ) | |
| Mr. Wang Dongchun, | ) | |
| No.2 1-7-2 Guang Chang Road, | ) | |
| Shenhe District, Shen Yang City, | ) | |
| Liaoning Province, P.R. China, and | ) | |
| | ) | |
| Mr. Wang Yong, | ) | |
| No. 16 Kaifa Road, | ) | |
| Economic & Technological | ) | |
| Development Zone, | ) | |
| Shenyang, Liaoning Province, 110141, | ) | <u>COMPLAINT with Jury Demand</u> |
| P.R. China, | ) | |
| | ) | |
| Defendants. | ) | |

For his complaint against defendants Mr. Yang Haozhi, Mr. Yang Liang, Mr. Ge Bing, Mr. Wang Dongchun, and Mr. Wang Yong, John Lane ("Mr. Lane"), as the Receiver for Hall Street Company f/k/a The Robbins Company ("TRC"), alleges as follows:

## FACTUAL BACKGROUND

1. Mr. Lane was appointed as the Receiver for TRC pursuant to an Order Appointing Receiver entered on October 9, 2019 in the case captioned *Home v. The Robbins Company,* Case No. CV 19 921031 pending in the Court of Common Pleas for Cuyahoga County, Ohio (the "Receivership Proceedings").  Pursuant to paragraph 3.n of that Order, Mr. Lane is empowered to pursue claims that will benefit TRC.

2. Until early 2021, TRC was a leading developer and manufacturer of advanced, underground construction machinery, i.e., Tunnel Boring Machines ("TBMs").  In early 2021, TRC sold its assets as part of the Receivership Proceedings and ceased manufacturing TBMs.

3. The design and manufacture of TBMs is a capital-intensive business.  The following is a picture of a TRC "Main Beam" tunnel boring machine:



The front of the TBM is a rotating cutterhead that matches the diameter of the tunnel. The cutterhead holds disc cutters (ranging from 14″ to 20″ in diameter) which are strategically positioned on the cutterhead depending on the rock type.  As the cutterhead turns, hydraulic

Electronically Filed 08/23/2021 15:27 / / CV 21 952011 / Confirmation Nbr. 2333293 / CLJSZ

cylinders push the cutters into the rock. The rolling disc cutters fracture the rock and form the tunnel. The cutterhead on a TBM can range from 10 to 50 feet in diameter, and the entire TBM can be over 300 feet in length.

4.     In August 2016, TRC entered into a transaction with Northern Heavy Industries Group. Co., Ltd. ("NHI"), pursuant to which NHI effectively acquired approximately 60% of TRC's equity. The few remaining shareholders were individuals who were employed by or affiliated with TRC. Lok Home ("Mr. Home"), TRC's President, was the largest minority shareholder.

5.     Following the NHI transaction, TRC had only a few shareholders and its shares were not traded in a securities market. Consequently, TRC was a "close corporation" under Ohio law.

6.     One of the principal reasons for TRC to enter into the transaction with NHI was for NHI to assist TRC to obtain working capital for use in TRC's business, either from bank loans or other financial arrangements. At that time, NHI was indirectly owned by the provincial Chinese government and was headquartered in Shenyang, China. NHI was one of the top three manufacturers of heavy equipment, including TBMs, in China and competed in the TBM market under its own name and through NFM Technologies, a French TBM manufacturer, which NHI had acquired in 2007. As such, TRC's management believed NHI was well positioned to assist TRC in obtaining additional working capital.

7.     NFM Technologies had facilities in Le Creusot, Bagnols-sur-Cèze, and Lyon, France, at which it manufactured various items of industrial equipment including tunnel boring machines of four to more than fifteen meters in diameter.

Electronically Filed 08/23/2021 15:27 / / CV 21 952011 / Confirmation Nbr. 2333293 / CLJSZ

8.      Not long after NHI acquired a controlling interest in TRC, NFM began to show signs that it was suffering financial issues as a result of NHI's management.  In August 2018, NFM was placed into receivership and eventually sold to Mühlhäuser, a German company.  NFM was eventually absorbed into Mühlhäuser, and the surviving company no longer exists.

9.      Defendants Mr. Yang Haozhi ("Mr. H. Yang")[1], Mr. Yang Liang ("Mr. L. Yang"), Mr. Ge Bing ("Mr. Ge"), Mr. Wang Dongchun ("Mr. D. Wang"), and Mr. Wang Yong ("Mr. Y. Wang") (collectively "Defendants") are all current or former employees of NHI and residents of the Peoples Republic of China.  From at least August 2016 until June 2018, Mr. H. Yang was a senior executive at NHI and was responsible for all overseas business.  During that same time period, Mr. Ge was also a senior executive at NHI and was the Manager of the NHI Overseas Department.  During the relevant time period, Mr. L. Yang was the Manager of the NHI Legal Department.  After June 2018, all of the Defendants remained employed by or affiliated with NHI throughout the time period relevant to this Complaint.

10.     On November 1, 2016, the TRC Board of Directors met in Solon, Ohio.  At that meeting, Messrs. H. Yang, D. Wang and Ge were elected as Directors of TRC.  Mr. H. Yang was elected as the Chairman of the Board.  TRC's other two board members were Mr. Home and Doug Harding (the "Minority Directors").

11.     At the November 1, 2016 board meeting, Mr. D. Wang was also elected to be TRC's Chief Financial Officer.  Subsequently, in May 2017, Mr. D. Wang resigned as CFO and was replaced by Mr. Y. Wang, and in April 2018, Mr. D. Wang resigned as a director of TRC and Mr. L. Yang was elected to replace him (for purposes of this Complaint, the term "NHI

---

[1]  In China, the surname is typically listed first, with the given name listed second, whereas, in the United States, the given name is listed first and the surname second.  For purposes of this complaint, Mr. Lane will endeavor to use surnames to identify all relevant individuals.

Directors" will mean Mr. H. Yang, Mr. D. Wang and Mr. Ge for the period from November 2016 until April 2018, and Mr. H. Yang, Mr. L. Yang and Mr. Ge for the period from April 2018 until present).

12.     At the November 1, 2016 Board meeting, each of Mr. H. Yang, Mr. D. Wang and Mr. Ge represented to the Minority Directors and other TRC representatives in attendance that they would work closely with NHI to quickly obtain a working capital line of credit for TRC. These representations were false when made.   NHI wanted to divert lucrative opportunities from TRC to NHI.  Like NFM, TRC would continue to struggle financially.  NHI was thereby able to ward off competition from existing competitors and to tie up capacity to keep potential competitors from entering the market.  Mr. H. Yang, Mr. D. Wang and Mr. Ge made these statements, knowing them to be false, or with utter disregard as to whether they were true or not, with the intent to mislead TRC and the Minority Directors into relying on the statements.  TRC and the Minority Directors justifiably relied on the false statements and did not cause TRC to seek other forms of financing to support TRC's operations.  TRC was injured as a result of its and the Minority Directors' reliance on the false representations that Mr. H. Yang, Mr. D. Wang and Mr. Ge would work closely with NHI to quickly obtain a working capital line of credit for TRC.

13.     At the November 1, 2016 Board meeting, the directors discussed NHI's commitment to obtain a loan in the amount of $22.2 Million to TRC so that TRC could pay off a "Shareholder's Bridge Loan."  The Shareholder's Bridge Loan had been part of the financing of the August 2016 transaction, and NHI had committed to arrange another loan so that the Shareholder's Bridge Loan could be retired.  Mr. H. Yang, Mr. D. Wang and Mr. Ge represented that they would make payment of the Shareholders Bridge Loan a priority after returning to

China.   These representations were false when made.   Mr. H. Yang, Mr. D. Wang and Mr. Ge made these statements, knowing that NHI would not take any steps to arrange a new loan to pay off the Bridge Loan.  They knew that NHI intended to keep the Shareholder's Bridge Loan in place so as to keep TRC financially weak and an ineffective competitor against NHI.  They made these misrepresentations with the intent to mislead TRC and the Minority Directors into relying on the statements.  TRC and the Minority Directors justifiably relied on these false statements and did not cause TRC to seek other forms of financing to repay the Shareholders Bridge Loan.

14.     Although the NHI Directors at all times had the ability to control TRC, they did not authorize or instruct TRC's officers to seek alternative financing and the CFOs appointed by the NHI Directors never made any effort to seek authorization to seek alternative financing.  The CFOs appointed by the NHI Directors failed to act despite pleas from other officers and employees of TRC for assistance in obtaining financing for the company.

15.     The failure to repay the Shareholders Bridge Loan eventually caused TRC to enter into the Receivership Proceedings.  TRC was thereby injured as a result of its reliance on Defendants' false representations.

16.     The next TRC Board meeting occurred on January 5 and 6, 2017.  At that Board meeting, the Board reviewed and discussed portions of TRC's Business Plan. Some of the discussion topics included:

- How TRC normally deals with customers during the sales process.
- Strengths and weaknesses of NFM and TRC designs.
- How NHI/NFM and TRC will deal with new projects in the future.

Some of the information discussed and disclosed at the TRC Board meeting was confidential and proprietary.  TRC and the Minority Directors would not have disclosed this information to the

NHI representatives without the understanding that the NHI representatives owed a fiduciary duty of loyalty to TRC to keep that information from being used to TRC's disadvantage.

17.     At the January 2017 Board meeting, Mr. H. Yang, Mr. D. Wang and Mr. Ge reported that they were still making efforts to enable TRC to pay the Shareholder's Bridge Loan and to obtain additional working capital for TRC, but they also claimed that new regulations were slowing down the process.  To the extent new regulations were slowing down the process, the purpose was to hinder TRC's ability to compete with a state-owned company.  The statements, therefore, were misleading.  Mr. H. Yang, Mr. D. Wang and Mr. Ge did not have reason to believe that TRC would pay the Shareholder's Bridge Loan or that NHI would provide additional working capital for TRC.  TRC and the Minority Directors justifiably relied on these misleading statements and TRC was damaged as a result.

18.     In May 2017, TRC requested that Mr. Ge obtain "cash flow and project funding" for a project on which TRC was working and for which it needed working capital assistance from NHI.

19.     Despite his fiduciary duty to TRC as a member of TRC's Board of Directors, Mr. Ge did not work to obtain working capital assistance for TRC.

21.     On May 15, 2017, Mr. D. Wang resigned as the CFO of TRC and Mr. Y. Wang was appointed to be the new CFO.  During his tenure as CFO for TRC, Mr. D. Wang failed to perform any of his duties as CFO.  He did not set the financial direction of the TRC.  He did not manage or assist the company to obtain necessary financing.  He did not attend to the financial health of the company.  As a result of Mr. D. Wang's failure as CFO, TRC struggled to present audit reports in a timely manner as information required to complete the footnotes and required representations was difficult or impossible to obtain.  Various third parties, including, but not

7

limited to, the Surety Group, the Commercial Insurance Brokers/Underwriters, customers, and various vendors, would routinely request copies of TRC's audited financial for legitimate business reasons. In the absence of audited financials, these third parties would reduce or cease their business dealings with TRC. The last year in which TRC was able to have its financials audited was in 2017. Mr. D. Wang's failure to perform his duties as CFO caused TRC to be damaged.

22.     On May 27, 2017, Brian Khalighi, a TRC representative, sent an email to Mr. Ge and Bu Rui regarding the Mumbai project and complained that, "[w]e simply do not have any progress to report because of the major delays and inactions by NHI. Robbins good reputation of the last 60 years is in serious danger of being tarnished and lost in India and Turkey. Robbins cannot afford to lose reputation and credibility in the international markets."

23.     On May 29, 2017, Mr. Ge responded to Mr. Khalighi by forwarding an email from Mr. H. Yang in which Mr. H. Yang reported that, notwithstanding its earlier commitments to provide working capital to TRC, "NHI has no enough money for Mumbai project payment." Notwithstanding their fiduciary duties to TRC, there is no evidence that either Mr. Mr. H. Yang or Mr. Ge tried to persuade NHI to honor its contractual commitments to assist TRC to obtain necessary working capital from bank loans or other financial arrangements for the use in TRC's ordinary course of business. Neither Mr. H. Yang nor Mr. Ge prioritized the interests of TRC above the interests of NHI.

24.     On June 20, 2017, Doug Harding, one of the Minority Directors, sent an email to Mr. Ge stating, in part: "I have checked with the Robbins PM [project manager] for both Mumbai 1 and Mumbai 2 and we are falling further and further behind with the delivery schedule and no news on a recovery plan or what is the current schedule. This will cause big

Electronically Filed 08/23/2021 15:27 / / CV 21 952011 / Confirmation Nbr. 2333293 / CLJSZ

problems for both NHI and Robbins as we will lose creditability in India. I need your urgent help in mitigating the delays and to put the schedules back on track. Please review with NHI top management and see what can be done."  Despite this plea from a fellow director for help, and notwithstanding his fiduciary duty to TRC, Mr. Ge made no apparent effort to assist TRC.

25.　　On September 12, 2017, a meeting took place between and among various TRC representatives, including Mr. Home, Clark Lubaski, Doug Harding, Biyue Li and two of the NHI Directors, Mr. H. Yang and Mr. Ge, along with an NHI representative, Liu Hequn.  At that meeting Mr. H. Yang and Mr. Ge promised to cause NHI to provide certain financing assistance to TRC, but, notwithstanding their promises to do so, neither Mr. H. Yang and Mr. Ge made any apparent effort to fulfill their promises.

26.　　On June 12, 2018, Mr. Home advised Mr. Ge that TRC could not make certain payments and that its suppliers were refusing to ship.  Mr. Home emphasized that TRC was struggling because of the lack of promised financial support from NHI.  Mr. Ge responded by advising Mr. Home's that NHI had filed "Restructuring" in China, the equivalent of bankruptcy under Chinese law, and that TRC should not expect any support from NHI.

27.　　On June 22, 2018, counsel for TRC sent a letter to NHI providing it with notice of breach of its contractual commitments to TRC.  (Those breaches are not the subject of this lawsuit.)  On June 28, 2018, Sun Fengdao ("Mr. Sun") responded to the letter from TRC's counsel admitting that NHI had failed to provide the promised financial support to TRC, but claiming that NHI's "original intention" for TRC "has not changed."  It appears that the "original intention" was not to help TRC, but to weaken it as a competitor in the TBM market.

28.　　In June 2018, Mr. Sun replaced Mr. Ge as the Manager of the NHI Overseas Department and Mr. Wang Xuemin replaced Mr. H. Yang as having responsibility for all

Electronically Filed 08/23/2021 15:27 / / CV 21 952011 / Confirmation Nbr. 2333293 / CLJSZ

overseas operations. Neither Mr. Ge nor Mr. H. Yang made any effort to have either of those individuals replace them on the TRC Board of Directors.

29. On July 5, 2018, Mr. Home sent an email to Mr. Ge asking, "Does the Robbins Board still exist and do the NHI Robbins Board Members have any Power?" In his July 6, 2018 response, Mr. Ge acknowledged that he understood why Mr. Home would feel he had been "deceived in the transaction of TRC shares." Mr. Ge admitted that NHI had failed to honor its contractual commitments to provide financial support to TRC. In a startling admission, Mr. Ge also stated that although the "TRC board still exist, and the NHI members also have power," the NHI Directors "must follow" the instructions from NHI's management "like before." In other words, Mr. GE was admitting that the NHI Directors had conflicting loyalties and that, notwithstanding the fact that they owed their primary obligations to TRC, they were, in fact, honoring their allegiance to NHI – not TRC – and, "like before," they would be exercising their power for the benefit of NHI, regardless of the consequences for TRC.

30. On July 18, 2018, Mr. Home requested a special board meeting to take place in Shenyang, China on July 26 or 27, 2018 (no Board meeting had occurred since January 2017). The purpose of the special meeting was to discuss how best to manage TRC now that NHI had entered Restructuring proceedings.

31. None of the NHI Directors responded to Mr. Home's request. Instead, Mr. Sun responded that NHI wanted to "postpone" the requested Board meeting. In fact, no Board meeting occurred in July 2018.

32. After effectively rejecting Mr. Home's request for a special Board meeting, Mr. Sun then requested that TRC provide NHI with TRC's audited 2017 Financial Statements, an internal financial report for the first six months of 2018, a report of pending orders and a cash

Electronically Filed 08/23/2021 15:27 / / CV 21 952011 / Confirmation Nbr. 2333293 / CLJSZ

flow projection.  This information was ostensibly to provide NHI with information to assess the value of TRC in connection with NHI's restructuring.  TRC provided some of the requested information, but needed certain information from the NHI Directors to allow the auditors to finalize the 2017 audit.

33.     On September 7, 2018, Lauren Hudkins, a TRC representative, sent an email to Mr. Y. Wang, TRC's official CFO, to follow up on earlier requests for the information needed to conclude the 2017 audit, including a request for confirmation that the NHI Directors remain on the TRC Board and requesting that the NHI Directors sign a Management Representation letter.

34.     On September 13, 2018, Mr. Sun responded that he would obtain the signatures from the NHI Directors to the Management letter as quickly as possible. Mr. Y. Wang, the CFO, provided the signatures of the NHI Directors a few days later.  In so doing, Mr. Y. Wang was acknowledging his duties as CFO and the NHI Directors were acknowledging their duties as directors.

35.     On February 15, 2019, TRC advised the NHI Directors and Mr. Sun that, "matters have gone substantially negative for Robbins in the last 4 to 5 months" and that "we are at a significant risk of not being able to meet our minimum payment Obligations within the next 2-3 months."

36.     On March 27, 2019, Mr. Home sent an email to Mr. Sun advising him that Power China had contacted TRC to inquire as to whether TRC would enter into a joint venture with Power China "for the manufacture, design and sales of TBMs."  Power China disclosed that one "of the prime target projects for this new JV is the Sichuan-Tibet Rail Project (which requires 40 TBMs)."  Mr. Sun disclosed this information to the NHI Directors, among others.

37.     The Power China joint venture was clearly within TRC's line of business – it was an opportunity to design and build, or participate in the design and build, of 40 or more TBMs.

38.     Absent the fact that NHI owned a substantial equity interest in TRC, and that the NHI Directors constituted a majority of TRC's Board, Mr. Home would not have disclosed the Power China opportunity to the NHI representatives, including Mr. Sun and the NHI Directors.

39.     TRC would significantly benefit from the Power China joint venture. The opportunity to participate in the design and build of over 40 TBMs would have put TRC on sound financial footing. The purchase price for a typical TBM at that time was $10 Million to $30 Million and 40 TBMs would have provided a profitable base of work for approximately five years. TRC was in a position to pursue the opportunity with Power China.

40.     Under the circumstances, TRC could reasonably expect to pursue and benefit from the Power China opportunity.

41.     On April 1, 2019, Mr. Home requested approval to move forward with negotiating a joint venture with Power China. Mr. Home cautioned that if TRC did not move quickly to take advantage of this opportunity, it could easily lose the opportunity to Herrenknecht, one of TRC's major competitors. Mr. Home requested that Mr. Sun "arrange for the requested approval," which would involve approval from the NHI Directors.

42.     Initially, the NHI Directors agreed that this was a great opportunity for TRC and, in early April 2019, they all signed a Board resolution authorizing Mr. Home to negotiate a joint venture with Power China.

43.     On May 4, 2019, Mr. Sun advised Mr. Home that NHI's reorganization was completed and that Liaoning Fangda Group Industrial Co., Ltd. ("Fangda") was now NHI's controlling shareholder.

44.     On May 11, 2019, Mr. Sun advised Mr. Home that Fangda now wanted to participate in the discussions with Power China.

45.     On May 16, 2019, Mr. Sun requested Mr. Home to postpone further discussions with Power China to give Fangda time to complete the "adjustment of our organization." Mr. Home objected to any delay.

46.     Also on May 16, 2019, Mr. Home met with Mr. Xuemin Wang, the new president of NHI, to discuss TRC's management. Other attendees at the meeting included two of the NHI Directors - Mr. H. Yang and Mr. Y. Wang. At that meeting, Mr. Xuemin Wang told Mr. Home that NHI intended to send a working group to the United States to review TRC's assets, finances, human resources, and production operations. Mr. Xuemin Wang also told Mr. Home that NHI intended to exert its rights as the majority shareholder, and that TRC's Board of Directors should be responsive to NHI's desire to exercise full control over TRC. Of course, the NHI Directors already had effective control over TRC as a result of their majority position on the Board. NHI's desire for "full control" appears to have meant that any joint venture with Power China would be solely for the benefit of NHI, regardless of the adverse impact on TRC. The NHI Directors breached their duties to TRC by not objecting to NHI's efforts to take "full control."

47.     NHI prepared minutes of the May 16, 2019 meeting, but those minutes did not accurately reflect what transpired at the meeting in that they claim that Mr. Home agreed to much of what had been dictated to him when, in fact, he did not agree. Mr. Home expressed his belief that NHI's efforts to take control of the Power China transaction would result in TRC losing the opportunity to joint venture with Power China.

48.     On May 18, 2019, Mr. Home met with Power China to negotiate a Memorandum of Understanding that would establish a joint venture between TRC and Power China.

49.     On May 19, 2019, Mr. Home reported to Mr. Sun that the meeting with Power China had gone well and that he would send a final draft of the Memorandum of Understanding once it was available.  Mr. Home also noted that the joint venture with Power China was essential to TRC's "survival."

50.     On May 21, 2019, Mr. Sun advised Mr. Home that NHI would not approve the Power China transaction.  Mr. Home again responded that the joint venture was essential to TRC's survival.  Although the NHI Directors had previously authorized Mr. Home to pursue the Power China joint venture, they then subordinated the best interests of TRC to NHI's interests.

51.     On May 23, 2019, Mr. Home sent an email to Mr. Sun stating, in part "We need the MOU approved by Robbins Board of Directors before June 13th. What steps and information will it take to do this."  Mr. Sun provided no meaningful response and the NHI Directors provided no response at all.

52.     On June 20, 2019, Mr. Home reported to Mr. Sun that he had obtained an extension of time from Power China to obtain approval from the TRC Board for the MOU and requested a Board meeting for June 27 or 28 to discuss the MOU.

53.     On June 22, 2019, Mr. Home sent an email to Mr. Sun and Mr. Ge stating, in part:

I have heard nothing back as regards this requested meeting.  Please consider this email an official request to hold a Robbins Board Meeting to address the matter of Robbins entering a Joint Venture with Power China. The meeting is requested on June 28th in Shenyang.

54.     On June 26, 2019, Mr. Home sent an email to Mr. Sun in which he inquired, among other things, whether all of the NHI Directors would be able to attend the meeting.  Mr. Home also invited Mr. Xuemin Wang, the new president of NHI, to attend the meeting.

55.     On June 30, 2019, Mr. Sun advised Mr. Home that if Mr. Xuemin Wang did not attend the Board meeting, none of the NHI Directors would take any action at the meeting.  In addition, Mr. Sun reported that Mr. H. Yang "wants to quit the board."

56.     On June 30, 2021, Mr. Home notified Mr. Sun that, "the functioning of the Board is a very serious matter under USA corporate law," and that Mr. H. Yang could not merely absent himself from the Board meeting.   Mr. Home also advised Mr. Sun that he was scheduled to meet with Power China on July 4, 2019, the day after the scheduled TRC Board meeting, and that he expected the Board to provide him with guidance for his meeting with Power China.

57.     On June 30, 2019, in a follow up email, Mr. Home circulated an agenda for the Board meeting providing that the following items were to be discussed:

1.  Approval of the Board to continue negotiating with Power China and conclude a contract. NHI well informed on this matter.

2.  The Robbins Company immediately needs, as required by USA law, all personal data of the new Managing Director, or General Manager or Chief Executive Officer or Owner of NHI shares.  If such data is not immediately supplied our banks will stop our banking agreements and our business will stop.
Further supporting details supplied at meeting.

3.  Pledge of financial support for The Robbins Company by the new owners of NHI to satisfy our bonding company.  Without such a pledge of support we cannot undertake significant new contracts.
Details of current bonding supplied at meeting.

4.  NHI to support a line of credit of minimum $5 million USD (preferably $30 million USD) to allow Robbins to pay our vendors so we can finish existing and new contracts.
Cash flow projections supplied at meeting.

58.     At the Board meeting on July 3, 2019, as to the first agenda item, the NHI Directors in attendance took the position that TRC should only engage in activities that benefit NHI as the majority shareholder. The NHI Directors in attendance took the position that NHI would have to own 51% of any joint venture with Power China, rather than TRC entering into

the joint venture with Power China. In essence, the NHI Directors were trying to divert the Power China opportunity to their benefit and the benefit of their employer, NHI, and take it away from TRC to the disadvantage of TRC and its minority shareholders.

59. Mr. Home and Mr. Harding explained that Power China was only interested in a joint venture with TRC, and that NHI's insistence on owning 51% of the joint venture would destroy the opportunity and adversely impact TRC's ability to survive. Mr. Home and Mr. Harding urged the NHI Directors to work for TRC's benefit. The NHI Directors in attendance refused.

60. The second agenda item related to a request for information so that TRC's banks could comply with their "Customer Identification Programs," also known as the "Know Your Customer" regulations. The Know Your Customer Regulations were originally adopted in 2002 by the Financial Crimes Enforcement Network (FinCEN). FinCEN is a bureau of the Treasury Department that collects and analyzes information about financial transactions to combat domestic and international money laundering, terrorist financing and other financial crimes. The regulations were adopted to implement section 326 of the PATRIOT Act.

61 Pursuant to Section 326 of the PATRIOT Act, FinCEN requires financial institutions to (a) verifying the identity of any person seeking to open an account; (b) maintain records of the information used to verify the person's identity, including name, address, and other identifying information; and (c) determine whether the person appears on any lists of known or suspected terrorists or terrorist organizations.

62.     In July 2016, FinCEN enacted new rules regarding beneficial ownership.  Those new rules required financial institutions to collect from any customer that was a legal entity the name, date of birth, address, and social security number or other government identification number (passport number or other similar information in the case of foreign persons) for individuals who own 25% or more of the equity interest of the legal entity (if any), and an individual with significant responsibility to control or manage the legal entity.

63.     As a result of Fangda's acquisition of a majority interest in TRC from the Chinese government, TRC had to provide the identifying information about any individual who owned more than 25% of Fangda to TRC's financial institutions to comply with the FinCEN regulations.  Mr. Home and Mr. Harding explained that the requested data was urgently needed, otherwise TRC's banks would be forced to stop doing business with TRC.  Obviously, the loss of banking relationships would likely force TRC to cease operations.  The NHI Directors in attendance claimed that NHI needed more time to determine whether it would produce the requested information.  In fact, they were delaying a response to interfere with TRC's efforts to secure the Power China opportunity and to help divert that opportunity to NHI.

64.     As to the third agenda item, Mr. Home and Mr. Harding explained that the Board Chairman, Mr. H. Yang, had the responsibility to call Board meetings at least four times per year and that the NHI Directors had an obligation to TRC to help the company, but that they had failed to do so.  In fact, the July 2019 Board meeting was the first Board meeting since the January 2017 Board meeting, and was the last Board meeting ever called.

65.     On July 11, 2019, Lauren Hudkins, a TRC representative, sent an email to Mr. H. Yang to follow up on the requests made at the Board meeting to obtain the required "Know Your Customer" information for the TRC banks.  Ms. Hudkins explained that TRC needed the

information only for certain individuals. Despite this limited requirement, the NHI Directors never arranged for this information to be provided.

66. On July 21, 2019, Mr. Sun advised Mr. Home that NHI intended to withhold all financial support for TRC until the minority shareholders gave up certain contractual rights they had pursuant to the original Shareholders' Agreement. Mr. Sun also informed Mr. Home that Mr. Xuemin Wang and Mr. H. Yang were refusing to sign the minutes of the July 3, 2019 Board meeting.

67. On July 23, 2019, Mr. Home responded by noting that the NHI Directors could not force the TRC minority shareholders to agree to change the Stockholders' agreement, but that he would consider any reasonable changes that they wanted to propose.

68. On September 19, 2019, Chase Bank closed TRC's accounts because TRC had failed to provide the required "Know Your Customer" information. This caused TRC to lose over $1 Million of cash collateral held by Chase Bank when Chase Bank used that cash collateral to repay a loan from a Chase affiliate to a TRC subsidiary in India. The loss of this cash collateral had a negative impact on TRC.

69. On October 6, 2019, Mr. Sun admitted that even though NHI's lawyer had verified that NHI needed to provide the "Know Your Customer" information, and even though Mr. Sun had warned that TRC would be "be shut down if we don't provide the information," NHI and the NHI Directors refused to produce the requested information.

<u>COUNT I - Breach of Fiduciary Duty against Directors</u>

70. Mr. Lane incorporates by reference the allegations in paragraphs 1 through 69 of this Complaint.

Electronically Filed 08/23/2021 15:27 / / CV 21 952011 / Confirmation Nbr. 2333293 / CLJSZ

71.     As directors and officers of TRC, the individual defendants owed various fiduciary duties to TRC, including a duty of good faith, a duty of care, a duty of loyalty, a duty to refrain from self-dealing, and a duty of disclosure.

72.     The duty of care obligates a director or officer to exercise the care that an ordinarily prudent person in a like position would use under similar circumstances.  The duty of care requires that a director's decision be made on the basis of reasonable diligence in gathering and considering material information.  Directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them.  Directors breach their duty of care by failing to obtain reasonably available material information.

73.     Once informed, directors must exercise their honest judgment in the lawful and legitimate furtherance of corporate purposes.   A board may not either formally or effectively abdicate its statutory power and fiduciary duty to manage and direct the management of the business and affairs of the corporation.

74.     The duty of loyalty requires a director to perform in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation.

75.     Because the defendants were simultaneously employees of NHI and officers or directors of TRC, they had conflicting loyalties.  They nevertheless owed their primary obligations to TRC.  As a result of their fiduciary duties to TRC, they were obligated to put TRC's interests ahead of NHI's interests.  As explained above, they failed to do so.

76.     Although Ohio extends the protections of the business judgment rule to directors, to be entitled to that protection, a director must show an exercise of judgment, not simply the existence of a business decision.   A director may not seek the protection of the business judgment rule on the ground that he made no decisions and took no actions.  The Defendants are

not entitled to the protections of the business judgment rule because they failed to act in good

faith, they failed to properly inform themselves about TRC's operations, they failed to conduct

Board meetings as required and needed, and they placed the interests of NHI above those of

TRC.

77.     Although the Shareholders Agreement for TRC required regular board meetings

(four time per year), Mr. H, Yang failed and refused to call any board meetings other than the

initial board meeting in November 2016 and a second board meeting in January 2017.  The only

other board meeting occurred on July 3, 2019, which was an emergency meeting called by the

Minority Directors.  The lack of regular board meetings substantially interfered with TRC's

business operations.  The failure to call board meetings was not in the best interests of TRC.  By

failing to call board meetings, the NHI Directors effectively abandoned TRC.

78.     The failure to call board meetings was an intentional dereliction of duty and a

conscious disregard for Mr. H. Yang's responsibilities.

79.     In the absence of board meetings, TRC regularly provided to its board members

and officers, including each of the Defendants, proprietary and confidential information of the

type that would normally be reviewed at board meetings.  TRC received little to no feedback

from the NHI Directors and either CFO.  TRC subsequently learned that the Defendants were

sharing TRC's proprietary and confidential information with NHI employees who did not have a

legal right or need to know the information, but who were using it to unfairly compete with TRC

in the TBM marketplace.  Each of the Defendants had a fiduciary duty of loyalty to TRC to

maintain the confidence of the competitively sensitive information to which he had access.  TRC

relied on the existence of this fiduciary duty in making the competitively sensitive information

available to each Defendant.  By disclosing confidential information to NHI employees who did

not have a legal right or need to know the information, each Defendant acted fraudulently and breached his fiduciary duties to TRC.  TRC was damaged as a result of this conduct.

80.     The NHI Directors were not disinterested directors because of their employment relationship with NHI.  Each of the NHI Directors placed himself in a position of conflicting loyalties and, as described above, subsequently violated his primary obligation to TRC.

81.     Each of the NHI Directors recognized that the joint venture between TRC and Power China was a valuable corporate opportunity for TRC.  Each recognized that the joint venture with Power China offered TRC an opportunity to stabilize its finances and return to profitable operations.  Each also recognized that the Power China opportunity would be a valuable opportunity for NHI.  Each knew that TRC was in a position to take advantage of the Power China opportunity.  Although the NHI Directors acknowledged that the joint venture agreement with Power China would be a significant benefit to TRC, they refused to approve the project unless it was restructured to benefit NHI instead of TRC.  As a result of the NHI Directors' intransigence, TRC lost the opportunity to move forward with the Power China joint venture.  Each of the NHI Directors put the interests of his employer (NHI) ahead of TRC's interests.  In so doing, each of the NHI Directors breached his fiduciary duties to TRC.  In so doing, each caused damage to TRC.

82.     The NHI Directors were aware of TRC's need to provide information about NHI's new owners so that TRC's lenders could comply with the "Know Your Customer" regulations.  The NHI Directors knew that if TRC did not provide the required information, TRC's lenders would have to close TRC's accounts.  The NHI Directors nevertheless did not provide TRC with the required information and TRC's accounts were closed.  By failing to

provide the required information to TRC, the NHI Directors breached their fiduciary duties to TRC. TRC was damaged as a result of the NHI Directors' breach of fiduciary duties.

83.     Although NHI induced TRC to enter into the 2016 transaction by promising to provide TRC with financial support, NHI never fulfilled its promise of financial support. Instead, NHI acquired a controlling interest in TRC with the intent to cripple it and eliminate it as a viable competitor in the TBM marketplace. Each of the Defendants knew of NHI's plans and actively sought to conceal NHI's true intent from TRC and the Minority Directors. The Defendants did so by providing false assurances that NHI intended to honor its obligations. These false representations were made on multiple occasions including at the November 1, 2016 board meeting and at the January 2017 board meeting, as reflected in the minutes of those meetings. The Defendants' acts and omissions deceived TRC and the Minority Directors. TRC and the Minority Directors were justified in relying on the Defendants' deceptive statements. By making these misrepresentations, the Defendants breached their fiduciary duties to TRC and TRC was damaged as a result.

<u>COUNT II - Breach of Fiduciary Duty against Officers</u>

84.     Mr. Lane incorporates by reference the allegations in paragraphs 1 through 83 of this Complaint.

85.     As described above, both Mr. D. Wang and Mr. Y. Wang failed to perform their duties as CFO for TRC. As a result, they breached his fiduciary duties to TRC and caused it damage.

WHEREFORE, TRC prays for judgment in its favor and against the defendants, jointly and severally, in an amount sufficient to compensate it for the damages it incurred as a result of

the Defendants' breaches of their fiduciary duties to TRC and which TRC reasonably believes to

exceed $25,000, and for such other and further relief as this Court deems just.

_/s/ James B. Niehaus_

James B. Niehaus (0020128)

jniehaus@frantzward.com

Klevis Bakiaj (0093668)

kbakiaj@frantzward.com

FRANTZ WARD LLP

200 Public Square, Suite 3000

Cleveland, Ohio 44114

216.515.1660 – Telephone

216.515.1650 – Facsimile

Attorneys for Plaintiff John K. Lane,
Receiver for Hall Street Company fka The
Robbins Company

## JURY DEMAND

Mr. Lane demands a trial by jury.

_/s/  James B. Niehaus_

Attorney for Plaintiff

Common Pleas Court of Cuyahoga County, Ohio

**DESIGNATION FORM TO BE USED TO INDICATE THE CLASSIFICATION OF THE CAUSE**

John K. Lane, Receiver for Hall Street Company, f/k/a The Robbins Company

**Plaintiff**

Case Number: _____

Date: _____

Vs.

Mr. Yang Haozhi, et al

**Defendant**

Has this case been previously filed and dismissed? Yes ☐ No ■

Case #: _____    Judge: _____

Is this case related to any new cases now pending or previously filed? Yes ■ No ☐

Case #: CV 19 921031    Judge: Brendan Sheehan

**CIVIL CLASSIFICATIONS:** *Place an (X) In ONE Classification Only.*

**Professional Torts:**
☐ 1311 Medical Malpractice
☐ 1315 Dental Malpractice
☐ 1316 Optometric Malpractice
☐ 1317 Chiropractic Malpractice
☐ 1312 Legal Malpractice
☐ 1313 Other Malpractice

**Product Liability:**
☐ 1330 Product Liability

**Other Torts:**
☐ 1310 Motor Vehicle Accident
☐ 1314 Consumer Action
■ 1350 Misc. Tort

**Workers Compensation:**
☐ 1550 Workers Compensation
☐ 1531 Workers Comp. Asbestos

**Foreclosures:**
☐ Utilize Separate Foreclosure Designation Form

**Commercial Docket:**
☐ 1386 Commercial Docket
☐ 1387 Commercial Docket with Foreclosure

**Administrative Appeals:**
☐ 1540 Employment Services
☐ 1551 Other

**Other Civil:**
☐ 1500 Replevin/Attachment
☐ 1382 Business Contract
☐ 1384 Real Estate Contract
☐ 1388 Consumer Debt
☐ 1390 Cognovit
☐ 1391 Other Contracts
☐ 1490 Foreign Judgment
☐ 1491 Stalking Civil Protection Order
☐ 1501 Misc. Other
☐ 1502 Petition to Contest Adam Walsh Act
☐ 1503 Certificate of Qualification for Employment

**Amount of Controversy:**
☐ None Stated
☐ Less than $25,000
■ Prayer Amount more than $25,000

**Parties have previously attempted one of the following prior to filing:**
☐ Arbitration
☐ Early Neutral Evaluation
☐ Mediation
☐ None

*I certify that to the best of my knowledge the within case is not related to any now pending or previously filed, expect as noted above.*

Frantz Ward LLP

**Firm Name (Print or type)**

200 Public Square, Suite 3000

**Address**

Cleveland, OH 44114

**Address**

216-515-1660

**Phone**

James B. Niehaus

**Attorney of Record (Print or Type)**

0020128

**Supreme Court #**

jniehaus@frantzward.com

**Email Address**

/s/ James B. Niehaus

**Signature**

Electronically Filed 08/23/2021 15:27 /  / CV 21 952011 / Confirmation Nbr. 2333293 / CLJSZ